AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

Southern District of California



FILED

APR 2 3 2019

CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY                          DEPUTY

|  |  |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>One LG LM-X210MA (Aristo 2) cellular phone<br>IMEI #352737106931737 | )<br>)<br>)<br>)<br>)<br>) |

Case No.   **19MJ1655**

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A, incorporated herein by reference

located in the _____Southern_____ District of _____California_____ , there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B, incorporated herein by reference

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 952 and 960 | Importation of Methamphetamine |

The application is based on these facts:

See attached Affidavit of Special Agent Bryce Christensen, Homeland Security Investigations

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

SA Bryce Christensen, Homeland Security Investigations
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 4/23/19

*Judge's signature*

City and state:  San Diego, CA

Hon. Mitchell D. Dembin, United States Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF WARRANT

I, Bryce Christensen, being duly sworn, hereby state as follows:

## INTRODUCTION

1.     This affidavit supports an application for warrant to search the following electronic device (**Target Device**): LG LM-X210MA (Aristo 2) cellular phone, IMEI #352737106931737, as described in Attachment A (incorporated herein by reference), and seize evidence of crimes, specifically, violations of Title 21, United States Code, Sections 952 and 960, as described in Attachment B (incorporated herein by reference.)

2.     The **Target Device** was seized from Sagastegui incident to her arrest for violation of Title 21, United States Code, Sections 952 and 960, Importation of Methamphetamine, at the San Ysidro, California Port of Entry on February 8, 2019. The **Target Device** is currently in the possession of Customs and Border Protection ("CBP"), 9495 Customhouse Plaza, San Diego, CA, 92154.

3.     Based on the information below, there is probable cause to believe that a search of the **Target Device** will produce evidence of the aforementioned crimes, as described in Attachment B.

4.     The information contained in this affidavit is based upon my experience and training and consultation with other federal, state, and local law enforcement agents. The evidence and information contained herein was developed from interviews and my review of documents and evidence related to this case. Because this affidavit is made for the limited purpose of obtaining a search warrant for the **Target Device**, it does not contain all of the information known by me or other federal agents regarding this investigation, but only contains those facts believed to be necessary to establish probable cause. Dates, times and amounts are approximate unless otherwise noted.

//
//
//
//

1

**EXPERIENCE AND TRAINING**

5.     I am a Special Agent ("SA") with Immigration and Customs Enforcement ("ICE"), Homeland Security Investigations ("HSI"), and have been employed by HSI since February 2018. I am currently assigned to the Contraband Smuggling Group III, and my duties include investigating the trafficking of illicit controlled substances and the importation and distribution of illegal substances.

6.     I have received basic criminal investigator training and have received training in identifying various controlled substances and conducting Title 21 controlled substances investigations. I have completed training courses from the California Narcotics Officers Association ("CNOA") in order to further my knowledge of narcotics cases. I attended the Criminal Investigator Training Program ("CITP")—a 56-day course which teaches and tests the basic skills required to complete criminal investigations. I also attended the HSI Special Agent Training ("HSISAT")—a 71-day program managed by the HSI academy and taught by experienced HSI special agents who serve as subject matter experts in various investigative programmatic areas.  During my training, I learned the procedures for conducting multiple types of criminal investigations for various violations of federal and state laws including, but not limited to, narcotics smuggling, alien smuggling, fraudulent documents, weapons trafficking, and organized criminal activity.  Among the extensive legal training taught at CITP and HSISAT, I received training in both U.S. Customs laws as well as legal issues regarding search and seizure.  I have also completed Cellebrite UFED4PC and Physical Analyzer Training courses designed to familiarize investigators with methods of extracting and analyzing cellular phone data.

7.     In the course of my duties at HSI, I have worked as the case agent or support agent for various drug-related investigations. I conduct reactive investigations when individuals attempt to smuggle narcotics through the California Ports of Entry, and I also conduct proactive narcotics investigations of varying complexities.  I work with senior agents on a daily basis and have become familiar with the tactics, techniques, and procedures used by drug trafficking organizations to bring drugs into the United States from

2

Mexico. I have participated in dozens of narcotics smuggling cases, either as the case agent or in a support capacity. I have interviewed defendants, witnesses, and informants regarding the illegal trafficking of controlled substances. Additionally, I have participated in the execution of search warrants. Through these experiences, I have gained a working knowledge and insight into the operational habits of narcotics smugglers, with particular emphasis on those who attempt to import narcotics into the United States from Mexico through the San Diego international ports of entry.

8. Prior to becoming an agent, I was a Ranger and Sapper-qualified Infantry officer in the U.S. Army, with two tours to Afghanistan. I have a Master of Science degree in Strategic Intelligence from the National Intelligence University and a Bachelor of Science from West Point.

9. Based upon my training and experience as a Special Agent, consultations with law enforcement officers experienced in narcotics smuggling investigations, and all the facts and opinions set forth in this affidavit, I submit the following:

    a. Drug smugglers will use cellular telephones because they are mobile and they have instant access to telephone calls, text, web, and voice messages.

    b. Drug smugglers will use cellular telephones because they are able to actively monitor the progress of their illegal cargo while the conveyance is in transit.

    c. Drug smugglers and their accomplices will use cellular telephones because they can easily arrange and/or determine what time their illegal cargo will arrive at predetermined locations.

    d. Drug smugglers will use cellular telephones to direct drivers to synchronize an exact drop off and/or pick up time of their illegal cargo.

    e. Drug smugglers will use cellular telephones to notify or warn their accomplices of law enforcement activity to include the presence and posture of marked and unmarked units, as well as the operational status of Border Patrol checkpoints.

f.    Drug smugglers therefore generate many types of evidence including, but not limited to, cellular phone-related evidence such as voicemail messages referring to the arrangements of travel and payment, names, photographs, text messaging, and phone numbers of co-conspirators.

10.    Based on my training and experience, including consultations with other law enforcement personnel, I know that drug traffickers commonly use electronic devices such as cellular telephones to store names, telephone numbers, records, drug ledgers, and other information pertaining to drug trafficking activity. I know that cellular/mobile telephones can and often do contain electronic records, phone logs and contacts, voice and text communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data. This information can be stored within disks, memory cards, deleted data, and temporary or permanent files contained on or in the cellular/mobile telephone. Specifically, I know based upon my training, education, and experience investigating narcotics conspiracies that searches of cellular/mobile telephones yields evidence:

a.    tending to indicate efforts to import controlled substances from Mexico into the United States;

b.    tending to identify other facilities, storage devices, or services—such as email addresses, IP addresses, phone numbers—that may contain electronic evidence tending to indicate efforts to import controlled substances from Mexico to the United States;

c.    tending to identify co-conspirators, criminal associates, or others involved in smuggling-controlled substances from Mexico to the United States;

d.    tending to identify travel to or presence at locations involved in the smuggling of controlled substances from Mexico to the United States, such as, but not limited to, stash houses, load houses, or delivery points;

e.    tending to identify the user of, or persons with control over or access to, the subject phone; or

4

f.     tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data above.

11.     Based upon my training, experience, and consultation with other law enforcement officers, I am familiar with the ways in which drug traffickers conduct their business, including the various means and methods by which drug traffickers import and distribute drugs; use cellular telephones, emails, and text messages to facilitate drug activity.

12.     I also know from training and experience that drug traffickers periodically change or "drop" their telephones and/or telephone numbers in an attempt to avoid law enforcement interception of their conversations. Moreover, it is my experience that narcotics distributors purposefully use multiple communication devices (for example, cellular telephones) to keep law enforcement from understanding the full scope of their own and/or their organization's illicit conduct, in the event that their communications are being intercepted. I also know that drug traffickers frequently use text messaging to communicate with other traffickers in an effort to thwart law enforcement interception of communications.

13.     Through the course of my training, investigations, and conversations with other law enforcement personnel, I am aware that it is a common practice for narcotics smugglers to work in concert with other individuals and to do so by utilizing cellular telephones or other communication devices to maintain communications with co-conspirators in order to further their criminal activities. This is particularly true in cases involving distributional quantities of hard narcotics, such as methamphetamine. Typically, couriers smuggling controlled substances across the border are in telephonic contact with co-conspirators immediately prior to and following the crossing of the load vehicle, at which time they receive instructions on how to cross and where and when to deliver the controlled substance. Narcotics smugglers and their organizations use cellular and digital telephones, in part, because these individuals believe law enforcement is unable to track the originating and destination phone numbers of calls placed to and from cellular and digital telephones.

14.     Subscriber Identity Module ("SIM") Cards also known as subscriber identity modules are smart cards that store data for GSM cellular telephone subscribers. Such data

1  includes user identity, location and phone number, network authorization data, personal

2  security keys, contact lists and stored text messages. Much of the evidence generated by a

3  smuggler's use of a cellular telephone would likely be stored on any SIM Card that has been

4  utilized in connection with that telephone.

## FACTS SUPPORTING PROBABLE CAUSE

6      15.   On February 8, 2019, at approximately 12:35 p.m., Monserrat Sagastegui, a

7  United States Citizen, attempted to enter the United States at the San Ysidro, California,

8  Port of Entry in a black 2006 Jeep Grand Cherokee bearing California plates (the

9  "Vehicle"). A CBP Officer was conducting pre-primary roving inspections with his Human

10  and Narcotics Detection Dog, when the canine alerted to the spare tire attached to the

11  undercarriage of the Vehicle. Sagastegui told the CBP Officer that she had owned the

12  Vehicle for two weeks, that she was heading to work, and that she was not bringing anything

13  into the United States.

14      16.   The CBP Officer sent the Vehicle through the Z-Portal scanner, and the

15  operator noticed anomalies in the quarter panel and spare tire of the Vehicle. Upon further

16  inspection, CBP Officers removed 37 packages from the quarter panels and spare tire of the

17  Vehicle. The contents of the packages field-tested positive for the properties of

18  methamphetamine. The total weight of the methamphetamine was 18.22 kilograms (40.17

19  pounds).  Sagastegui was placed under arrest.

20      17.   Officers seized the **Target Device** incident to Sagastegui's arrest.[1] After being

21  advised of and waiving her rights under *Miranda*, Sagastegui denied knowledge of having

22  narcotics in her vehicle.  Sagastegui stated that she and her two children had been living in

---

[1]     On February 8, 2019, agents examined some of the phone's contents.  In an abundance of caution, I ask the court not to consider information agents may or may not have seen during that examination in determining whether there is probable cause for the requested warrant. Nothing from the February 8, 2019, manual review is offered to support probable cause in this application.

    I also declare that nothing from the prior search of the **Target Device** informs my decision to submit this affidavit to obtain a search warrant for the **Target Device**. I seek this affidavit independent of any information that was seen or reviewed (or not seen) in prior searches.

1 Imperial Beach, CA, with her friend ("S1") and her friend's husband ("S2") for the last
2 month. Sagastegui stated that S1 and S2 had been arrested for drug smuggling and had been
3 released from jail approximately one year ago. She said she could not remember the address
4 where she lived with S1 and S2 and her two children.

5        18. Sagastegui told agents that S2 had offered to sell her the Vehicle approximately
6 three weeks ago. She was to pay him $1,500.00 United States Dollars after she received the
7 money from her tax return. Sagastegui later amended her story to say that S2 offered to
8 give Sagastegui the Vehicle if she slept with him and paid $1,500, but she would not sleep
9 with him.

10        19. S2 told Sagastegui that she needed to fix the Vehicle's window because it was
11 broken. Initially, Sagastegui stated that approximately 2 days before the arrest, a friend of
12 S1's ("S3") offered to take the car to Tijuana to get the window fixed. Sagastegui said that
13 after S3 dropped off the vehicle to get it fixed in Tijuana, S3 returned the keys to Sagastegui
14 and told her the neighborhood in Tijuana where she could find it. Sagastegui later amended
15 her story to say she had given her keys to S2 because S2 said he had a friend who would
16 take the vehicle to Tijuana to be fixed.

17        20. Sagastegui stated that on February 8, 2019 she walked across the San Ysidro
18 pedestrian lanes and once she arrived in Tijuana she took a taxi to where the car was located
19 and picked up the car around 9:30 a.m.

20        21. After her arrest, Sagastegui was allowed use the **Target Device** to call her
21 mother so that she could make arrangements to ensure her children were picked up from the
22 location where she was living with S1 and S2.   Sagastegui informed her mother that she
23 had been arrested and stated something to the effect of "They found things that can f*** me
24 over in the vehicle." Sagastegui's mother stated something to the effect of that "You knew
25 that was going to happen, didn't you."

26        22. The Vehicle was registered to Ivonne Meza or David Serrano. There is a
27 release of liability to K&R Auto Sales in San Diego, CA.

28 //

23. On February 11, 2019, a complaint was filed charging Sagastegui with Importation of Methamphetamine in violation of Title 21, United States Code, Sections 952 and 960. On March 5, 2019, Sagastegui was charged by Indictment with one count of violating Title 21, United States Code, Sections 952 and 960, in the Southern District of California in case number 19-CR-0767-GPC.

24. Based upon my experience and investigation in this case and my experience investigating narcotics smugglers, I believe that Sagastegui may have used the **Target Device** to coordinate with co-conspirators regarding the importation of methamphetamine into the United States.

25. Accordingly, based upon my experience and training, consultation with other law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I believe that information relevant to the narcotics trafficking activities of Sagastegui, such as telephone numbers, made and received calls, contact names, electronic mail (e-mail) addresses, appointment dates, messages, pictures, audio files, videos, and other digital information are stored in the memory of the **Target Device**.

26. Drug trafficking conspiracies require intricate planning and coordination. This often occurs days, weeks, or even months prior to the actual importation of the drugs into the United States. Co-conspirators communicate with one another in efforts to ensure success in transporting their valuable cargo to its destination within the United States. Given this, I request permission to search the **Target Device** for items listed in Attachment B beginning on December 11, 2018, up to and including February 8, 2019. That date range is based on (1) Sagastegui's statement that she moved in with the man who sold her the Vehicle, S2, approximately one month before her arrest and (2) Sagastegui's statement that S2 offered to sell her the Vehicle approximately three weeks before her arrest.

## METHODOLOGY

27. It is not possible to determine, merely by knowing the cellular/mobile telephone's make, model and serial number, the nature and types of services to which the

8

1   device is subscribed and the nature of the data stored on the device. Cellular/mobile devices
2   today can be simple cellular telephones and text message devices, can include cameras, can
3   serve as personal digital assistants and have functions such as calendars and full address
4   books and can be mini-computers allowing for electronic mail services, web services and
5   rudimentary word processing. An increasing number of cellular/mobile service providers
6   now allow for their subscribers to access their device over the internet and remotely destroy
7   all of the data contained on the device. For that reason, the device may only be powered in
8   a secure environment or, if possible, started in "airplane mode" which disables access to the
9   network. Unlike typical computers, many cellular/mobile telephones do not have hard
10  drives or hard drive equivalents and store information in volatile memory within the device
11  or in memory cards inserted into the device. Current technology provides some solutions
12  for acquiring some of the data stored in some cellular/mobile telephone models using
13  forensic hardware and software. Even if some of the stored information on the device may
14  be acquired forensically, not all of the data subject to seizure may be so acquired. For
15  devices that are not subject to forensic data acquisition or that have potentially relevant data
16  stored that is not subject to such acquisition, the examiner must inspect the device manually
17  and record the process and the results using digital photography. This process is time and
18  labor intensive and may take weeks or longer.

19      28.    Following the issuance of this warrant, I will collect the subject cellular/mobile
20  telephone and subject it to analysis. All forensic analysis of the data contained within the
21  telephone and memory card will employ search protocols directed exclusively to the
22  identification and extraction of data within the scope of this warrant.

23      29.    Based on the foregoing, identifying and extracting data subject to seizure
24  pursuant to this warrant may require a range of data analysis techniques, including manual
25  review, and, consequently, may take weeks or months. The personnel conducting the
26  identification and extraction of data will complete the analysis within ninety days, absent
27  further application to this court.

28  //

9

**CONCLUSION**

30.    Based on all of the facts and circumstances described above, there is probable cause to conclude that Sagastegui used the **Target Device** to facilitate violations of Title 21, United States Code, Sections 952 and 960.

31.    Because the **Target Device** was promptly seized during the investigation of Sagastegui trafficking activities and has been securely stored, there is probable cause to believe that evidence of illegal activities committed by Sagastegui continues to exist on the **Target Device**.

32.    WHEREFORE, I request that the court issue a warrant authorizing law enforcement agents and/or other federal and state law enforcement officers to search the item described in Attachment A and the seizure of items listed in Attachment B, using the methodology described above.

I swear the foregoing is true and correct to the best of my knowledge and belief.

Bryce Christensen
HSI Special Agent

Subscribed and sworn to before me this _23_ day of April, 2019.

Hon. Mitchell D. Dembin
United States Magistrate Judge

## **ATTACHMENT A**

### PROPERTY TO BE SEARCHED

The following property is to be searched:

> LG LM-X210MA (Aristo 2) cellular phone
> IMEI #352737106931737
> (**Target Device**)

The **Target Device** is currently in the possession of the Customs and Border Protection, 9495 Customhouse Plaza, San Diego, CA, 92154

## **ATTACHMENT B**

### ITEMS TO BE SEIZED

Authorization to search the cellular/mobile telephone described in Attachment A includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular/mobile telephone for evidence described below. The seizure and search of the cellular/mobile telephone shall follow the search methodology described in the affidavit submitted in support of the warrant.

The evidence to be seized from the cellular/mobile telephone will be electronic records, communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data, for the period of December 11, 2018 to February 8, 2019:

- a. tending to indicate efforts to import controlled substances from Mexico into the United States;

- b. tending to identify other facilities, storage devices, or services–such as email addresses, IP addresses, phone numbers–that may contain electronic evidence tending to indicate efforts to import controlled substances from Mexico to the United States;

- c. tending to identify co-conspirators, criminal associates, or others involved in smuggling-controlled substances from Mexico to the United States;

- d. tending to identify travel to or presence at locations involved in the smuggling of controlled substances from Mexico to the United States, such as, but not limited to, stash houses, load houses, or delivery points;

- e. tending to identify the user of, or persons with control over or access to, the subject phone; or

- f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data above.

which are evidence of violations of Title 21, United States Code, Sections 952 and 960.